UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

|  |  |  |
|---|---|---|
| | : | Hearing Date: June 14, 2017 (1:30 pm) |
| In re: | : | |
| | : | Chapter 11 |
| FEDERATION EMPLOYMENT AND | : | |
| GUIDANCE SERVICE, INC. d/b/a FEGS | : | Case No. 15-71074 (REG) |
| | : | |
| Debtor. | : | |

-------------------------------------------------------------------x

|  |  |  |
|---|---|---|
| THE OFFICIAL COMMITTEE OF | : | |
| UNSECURED CREDITORS OF FEGS | : | Adv. Proc. No. 17-08100 (REG) |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| LOEB & TROPER LLP, | : | |
| | : | |
| Defendant. | : | |

-------------------------------------------------------------------x

## DEFENDANT LOEB & TROPER LLP'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT

STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, New York  10038-4982
(212) 806-5400

*Attorneys for Loeb & Troper LLP*

Of Counsel:

James L. Bernard
David M. Cheifetz

## <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS .......................................................................................................... 3

I.    Loeb & Troper ................................................................................................................ 3

II.   FEGS's Bankruptcy ....................................................................................................... 4

III.  FEGS's Pre-petition Operations ................................................................................... 5

IV.   FEGS's Alleged Improper Accounting......................................................................... 6

ARGUMENT ............................................................................................................................... 9

I.    Legal Standards............................................................................................................... 9

II.   The Complaint Fails to Allege That Loeb & Troper Departed From Accepted Standards of Practice................................................................................................... 11

III.  The Complaint Fails to Allege That Loeb & Troper Proximately Caused Any Damages to FEGS................................................................................................... 16

IV.   The Committee's Claims Are Time Barred ................................................................ 22

CONCLUSION.......................................................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abramo v. Teal, Becker & Chiaramonte, CPA's, P.C.*,
  713 F. Supp. 2d 96 (N.D.N.Y. 2010) ......................................................................25

*Apple Bank for Sav. v. PriceWaterhouseCoopers LLP*,
  70 A.D.3d 438 (1st Dep't 2010) ..........................................................................22

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................. *passim*

*Byrd v. City of New York*,
  No. 04-1396, 2005 WL 1349876 (2d Cir. June 8, 2005) .......................................3

*Cannonball Fund, Ltd. v. Marcum & Kliegman LLP*,
  No. 2011-651674, 2012 WL 9500858 (Sup. Ct. N.Y. Cty. Apr. 6, 2012), *aff'd*,
  110 A.D.3d 417 (1st Dep't 2013) ..........................................................................21

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002)...................................................................................3

*Cumis Ins. Soc'y., Inc. v. Tooke*,
  293 A.D.2d 794 (3d Dep't 2002) ...................................................................10, 11

*D.D. Hamilton Textiles v. Estate of Mate*,
  269 A.D.2d 214 (1st Dep't 2000) ............................................................. *passim*

*DeLollis v. Friedberg, Smith & Co., P.C.*,
  600 F. App'x 792 (2d Cir. 2015) ...........................................................................13

*Drabkin v. Alexander Grant & Co.*,
  905 F.2d 453 (D.C. Cir. 1990) ..............................................................................14

*In re: Federation Employment and Guidance Service, Inc.*,
  No. 15-71074 (REG) (E.D.N.Y. Bank.) .................................................................4

*Gold v. Lipsky, Goodkin & Co.*,
  No. 152519/12, 2013 WL 6516619 (Sup. Ct. N.Y. Cty. Nov. 27, 2013) ...................... *passim*

*Hardt v. Reliance Standard Life Ins. Co.*,
  560 U.S. 242 (2010)...............................................................................................24

*Hirsch v. Arthur Andersen & Co.*,
  178 B.R. 40 (D. Conn. 1994), *aff'd*, 72 F.3d 1085 (2d Cir. 1995) .........................22

*Italia Imports v Weisberg & Lesk*,
    220 A.D.2d 226 (1st Dep't 1995) .......................................................................15

*KBL, LLP v. Cmty. Counseling & Mediation Servs.*,
    123 A.D.3d 488 (1st Dep't 2014) .......................................................................10

*Kirschner v. Grant Thornton LLP*,
    No. 11604, 2009 WL 996417 (S.D.N.Y. Apr. 14, 2009)................................21, 22

*Kirschner v. KPMG LLP*,
    15 N.Y.3d 446 (2010) .......................................................................................14

*Kolbeck v. LIT Am., Inc.*,
    939 F. Supp. 240 (S.D.N.Y. 1996) ...............................................................10, 19

*Kristina Denise Enters., Inc. v. Arnold*,
    41 A.D.3d 788 (2d Dep't 2007) ..........................................................................9

*Lerner v. Fleet Bank, N.A.*,
    318 F.3d 113 (2d Cir. 2003)...............................................................................10

*Mishkin v. Peat, Marwick, Mitchell & Co.*,
    744 F. Supp. 531 (S.D.N.Y. 1990) .....................................................................13

*Motor Carrier Audit & Collection Co., a Div. of Delta Traffic Serv. v. Lighting*
    *Prod., Inc.*,
    113 B.R. 424 (N.D. Ill. 1989) ...........................................................................24

*Paladini v. Capossela, Cohen, LLC*,
    No. 11 Civ. 2252(LAP), 2012 WL 3834655 (S.D.N.Y. Aug. 15, 2012), *aff'd*,
    515 F. App'x 63 (2d Cir. 2013) ....................................................................10, 19

*In re Parmalat Sec. Litig.*,
    377 F. Supp. 2d 390 (S.D.N.Y. 2005).......................................................11, 13, 15

*In re Parmalat Sec. Litig.*,
    501 F. Supp. 2d 560 (S.D.N.Y. 2007), *aff'd sub nom. Pappas v. Bank of Am.*,
    309 F. App'x 536 (2d Cir. 2009) ...................................................................20, 22

*Pearlman v. Friedman Alpren & Green LLP*,
    300 A.D.2d 203 (1st Dep't 2002) .......................................................................21

*Phillips-Smith Specialty Retail Group II, L.P. v. Parker Chapin Flattau & Klimpl*,
    265 A.D.2d 208 (1st Dep't 1999) .......................................................................21

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013).........................................................................10, 19, 20

*Shearson Lehman Hutton, Inc. v. Wagoner*,
    944 F.2d 114 (2d Cir. 1991)...................................................................................14, 21

*Spool v. World Child Int'l Adoption Agency*,
    520 F.3d 178 (2d Cir. 2008)...........................................................................................9

*Williamson v. PriceWaterhouseCoopers LLP*,
    9 N.Y.3d 1 (2007) ..................................................................................................22, 23

*In re Yukos Oil Co. Sec. Litig.*,
    No. 04 Civ. 5243(WHP), 2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006)...........................9, 16

**Statutes**

11 U.S.C. § 108...............................................................................................................23, 24

**Other Authorities**

Fed. R. Bank. P. 9006(a)(1)(C)..............................................................................................24

Fed. R. Civ. P. 6(a)(1)(C) .......................................................................................................24

Fed. R. Civ. P. 8(a) .................................................................................................................25

Fed. R. Civ. P. 9(g) .................................................................................................................16

N.Y. C.P.L.R. § 214(6) ...........................................................................................................22

Loeb & Troper LLP ("Loeb & Troper") respectfully submits this memorandum of law in support of its motion, pursuant to Federal Rule of Civil Procedure 12(b)(6), as made applicable to this adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7012(b), for an Order dismissing the complaint filed by the Official Committee of Unsecured Creditors of FEGS ("Committee") with prejudice.

## PRELIMINARY STATEMENT

Despite having had two years to investigate potential claims on behalf of FEGS against Loeb & Troper, the Committee now brings only one bare-bones cause of action that fails to state a plausible claim for negligence. The complaint should be dismissed because it falls woefully short of alleging that Loeb & Troper did anything wrong to cause damage to FEGS.

<u>First</u>, the complaint fails to allege that Loeb & Troper breached a duty of care. The Committee takes issue with Loeb & Troper's annual audits of FEGS's financial statements for the fiscal years ending June 30, 2011 through June 30, 2013. However, rather than offer any explanation (let alone a plausible one) of how Loeb & Troper allegedly deviated from recognized and accepted standards of care when performing these audits, the complaint concedes that Loeb & Troper *properly* performed its most recent audit for 2014, and alleges that *FEGS* improperly accounted for certain doubtful accounts receivable on its 2011-2013 financial statements. The conclusory and inadequate allegations concerning Loeb & Troper's audits in those years do not satisfy applicable pleading standards.

<u>Second</u>, the complaint fails to allege that Loeb & Troper proximately caused any damage to FEGS. The Committee makes the outlandish claim that Loeb & Troper somehow caused FEGS's bankruptcy in 2015 by failing to adequately audit its receivables on one government contract in years 2011-2013. Yet, FEGS already admitted to this Court that FEGS filed for

1

bankruptcy because of a confluence of financial, operational, and administrative problems over many years—not a single "body blow" to FEGS in 2014 (Compl. ¶36)—that had nothing to do with any of the allegations in the complaint, particularly the sparse allegations the Committee now makes against Loeb & Troper. Moreover, FEGS's contemporaneous financial statements refute the Committee's revisionist effort to pin the blame for FEGS's insolvency on Loeb & Troper. The complaint alleges that FEGS underestimated certain doubtful accounts by, at most, approximately six million dollars (in total over a three-year period) despite having ***over a quarter billion dollars*** in annual revenue, tens of millions in total net assets, and millions of dollars in cash on hand. Whether from an income statement, balance sheet, or cash flow perspective, it is neither credible nor plausible that FEGS's solvency was impacted by any allegedly erroneous accounting for these receivables (which, again, was FEGS's alleged error, not Loeb & Troper's).

The Committee hedges its bets by also seeking alleged damages suffered not by FEGS but by its ***creditors***, such as incurred debt that was not repaid to creditors and losses incurred by holders of allowable claims. Yet, black-letter law only permits the Committee to bring claims belonging to the ***debtor*** to recover harm allegedly suffered by the debtor. Thus, even if these were plausible damages causally linked to anything Loeb & Troper did wrong (and they are not), the Committee has no legal standing to recover them.

Finally, even if the complaint sufficiently alleged that Loeb & Troper negligently and proximately caused damage to FEGS, such a claim would be barred by New York's three-year statute of limitations for professional malpractice and there is no valid basis for extending it.

In short, the Committee fails to allege that Loeb & Troper did anything wrong to cause harm to FEGS. The complaint should, therefore, be dismissed with prejudice for failure to state a plausible claim for relief.

## STATEMENT OF FACTS

### I.    Loeb & Troper

Loeb & Troper was FEGS's independent auditor for many years. In a series of separate and discrete engagement letters, FEGS hired Loeb & Troper to audit FEGS's financial statements for the fiscal years ending June 30, 2011 through June 30, 2014. Compl. ¶¶13, 33-35. Copies of these engagement letters are attached, respectively, as Exhibits A, B, C, and D (cited herein as "Ex. __") to the Declaration of James L. Bernard dated May 5, 2017 ("Bernard Declaration").[1] The engagement letters provided that the financial statements were the responsibility of FEGS's management, and that Loeb & Troper was responsible for performing its audits consistent with applicable professional standards. Ex. A at 2-3; Ex. B at 1-4; Ex. C at 2-4; Ex. D at 2-4. The engagement letters also provided that when conducting its audits, Loeb & Troper would consider FEGS's relevant internal controls, but not for the purpose of expressing an opinion on their effectiveness. Ex. A at 4; Ex. B at 4-5; Ex. C at 3; Ex. D at 3.

Loeb & Troper issued an opinion dated January 6, 2012 regarding FEGS's consolidated financial statements for the fiscal year ending June 30, 2011 ("2011 Audit"), an opinion dated December 17, 2012 regarding FEGS's consolidated financial statements for the fiscal year ending June 30, 2012 ("2012 Audit"), an opinion dated December 2, 2013 regarding FEGS's consolidated financial statements for the fiscal year ending June 30, 2013 ("2013 Audit"), and an opinion dated December 1, 2014 regarding FEGS's consolidated financial statements for the fiscal year ending June 30, 2014 ("2014 Audit"). Copies of these opinions are attached,

---

[1] In addition to the allegations of the pleading itself, the Court may consider documents that are attached to, incorporated by reference in, or integral to the complaint, and it may also consider matters that are subject to judicial notice. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). Matters of public record, including court filings, are subject to judicial notice. *Byrd v. City of New York*, No. 04-1396, 2005 WL 1349876, at *1 (2d Cir. June 8, 2005) (citing cases).

respectively, as Exhibits E, F, G, and H to the Bernard Declaration (and also cited herein as "Ex. __").[2] While the complaint alleges that FEGS's financial statements for the fiscal years ending June 30, 2011 through June 30, 2013 were incorrect,[3] it does not allege that FEGS's financial statements for the fiscal year ending June 30, 2014 contained any material misstatements or that Loeb & Troper did anything wrong in the 2014 Audit. Compl. ¶¶13, 33-35. To the contrary, during the 2014 Audit, after FEGS's management indicated that it would need to acknowledge certain outstanding receivables as bad debt (discussed further below), Loeb & Troper reviewed the issue and, as a result of this review, noted certain, proper findings in a management letter to FEGS. *Id.* ¶¶25, 34.

## II.    FEGS's Bankruptcy

FEGS filed for bankruptcy on March 18, 2015. *Id.* ¶1. FEGS is operating as a debtor in possession and no trustee has been appointed in the chapter 11 case. *Id.* The Committee purports to bring this complaint on behalf of FEGS's estate. *Id.* ¶5. On the very same day FEGS filed for bankruptcy, FEGS's CEO (and former COO), explained to this Court that FEGS's bankruptcy was caused by a host of reasons that had nothing to do with Loeb & Troper. *See* Affidavit of Kristin Woodlock Pursuant to Local Bankruptcy Rule 1007-4 and in Support of First Day Motions (Mar. 18, 2015), *In re: Federation Employment and Guidance Service, Inc.*, No. 15-71074 (REG) (E.D.N.Y. Bank.) [ECF No. 2] (attached as Exhibit I to the Bernard Declaration

---

[2] Consistent with the engagement letters, the opinions also define the relative obligations of FEGS and Loeb & Troper. Ex. E at 1; Ex. F at 1; Ex. G at 1; Ex. H at 1.

[3] The complaint relies throughout on consolidated financial statements, which include the operations of various non-debtor FEGS subsidiaries (*see, e.g.*, Ex. H at Note 1), without distinguishing between financial statements of the debtor and of the non-debtor subsidiaries. We, too, will refer to the consolidated financial statements, even though they include financial information for non-debtor entities, but as we address further below, this limitation on the financial statements impacts certain aspects of the complaint's allegations.

and cited herein as "Ex. I"). Specifically, FEGS conceded that its bankruptcy was caused by the

following "confluence of factors and events":

- A continuing decrease in revenue with no essential corresponding cost cuts (Ex. I ¶19);

- General operational and administrative inefficiencies (*id.* ¶19);

- An outdated financial management system (*id.* ¶19);

- Multiple space obligations which substantially exceeded the Debtor's physical needs and financial capabilities leading to significant unreimbursable costs as a result of the unallocated and vacant space (*id.* ¶19);

- An overly prohibitive administrative cost structure which was significantly more than target industry standards (*id.* ¶19);

- An inability to keep pace with the growing complexities of the organization as a whole (*id.* ¶19);

- The loss of key employees (*id.* ¶19);

- Historical concentration on top line growth without due concern to contract viability (*id.* ¶20);

- Numerous unprofitable agreements (*id.* ¶20);

- A failure to plan for the repayment of significant regulatory and governmental advances and contract termination costs (*id.* ¶20); and

- Working capital devoted to investments in for-profit affiliates outside usual service areas in hopes of generating income (*id.* ¶21).

### III.    FEGS's Pre-petition Operations

Prior to its bankruptcy, FEGS provided various health and social services throughout the

New York area. Compl. ¶7. FEGS had multiple sources of revenue, including various

government contracts, state and federal Medicaid funding, and private donations and grants. *Id.*

¶8. In its final fiscal year of operations before filing for bankruptcy (ending June 30, 2014), on a

consolidated basis, FEGS reported total revenues of $263,563,976 (an increase from 2013

revenue of $253,215,718). *Id.* ¶¶31-32; Ex. H at Ex. B (Consolidated Statement of Activities). In

5

that same year, FEGS reported total net assets of $39,472,622 (compared to $58,879,707 in 2013), including cash on hand of $10,205,618 (compared to $6,734,624 in 2013, an increase of more than 50% over the prior year). Ex. H. at Ex. A (Consolidated Balance Sheet); Ex. H at Ex. D (Consolidated Statement of Cash Flows). FEGS's reported change in net assets (the equivalent to net income of a for-profit entity) was a gain of approximately $2,700,765 in 2011, $124,988 in 2012, and $1,531,761 in 2013 (though, as explained further below, FEGS would otherwise have lost millions of dollars in 2013, but for a one-time extraordinary gain). Compl. ¶¶29-31. During the fiscal years ending June 30, 2011 through June 30, 2014, FEGS's management made certain estimates of doubtful accounts receivable and reported on its Consolidated Balance Sheet its accounts receivable net of such allowances for doubtful accounts. *Id.* ¶¶14-19; Ex. E at Ex. A, Ex. F at Ex. A; Ex. G at Ex. A; Ex. H at Ex. A. Similarly, during those same fiscal years, FEGS took charges for bad debt expenses on its Consolidated Statement of Expenses. Compl. ¶¶20-25; Ex. E at Ex. C, Ex. F at Ex. C, Ex. G at Ex. C, Ex. H at Ex. C.

## IV.    FEGS's Alleged Improper Accounting

The complaint focuses entirely on the accounting for just one source of FEGS's revenue: a government contract with the New York City Human Resources Administration ("HRA") to provide services for HRA's "WeCare" program. Through this program, in which FEGS participated pursuant to a series of contracts, FEGS assessed and aided individuals with medical or mental health disabilities. Compl. ¶¶9-10. FEGS was to be paid after achieving various milestones for services provided to clients in the WeCare program. *Id.* ¶10. The Committee now contends that, in light of FEGS's alleged (but unspecified) failures to achieve and document certain milestones and seek timely payment for its WeCare services, the HRA denied many of FEGS's payment requests and FEGS did not properly account for these WeCare receivables as

doubtful of collection or as bad debt in the fiscal years ending June 30, 2011 through June 30, 2013. *Id.* ¶¶11-12. This allegedly resulted in FEGS "overstating" its accounts receivables and change in net assets (i.e., net income) by unspecified amounts at unspecified times during those fiscal years. *Id.* ¶12.

Nevertheless, FEGS's management only acknowledged to Loeb & Troper that it had a problem with its accrued WeCare receivables after the fiscal year ending June 30, 2014 and FEGS waited until then to address the issue and report an allegedly cumulative loss as a bad debt expense for 2014. *Id.* ¶¶12, 25. FEGS's bad debt expense increased to $7,757,170 in 2014 from $1,436,238 in 2013 (an increase of $6,320,932). *Id.* ¶¶24-25.[4] Although FEGS said nothing about this or ever asserted any claims against Loeb & Troper prior to filing for bankruptcy in the months after it received the 2014 Audit, when it later filed for bankruptcy, or even in the two years following its bankruptcy, the Committee now alleges that FEGS somehow could have avoided liquidation under chapter 11 if the losses pertaining to the WeCare program had been recognized (i.e., written off as bad debt expenses) on FEGS's previous financial statements at some unspecified point or points in time between 2011 and 2013. *Id.* ¶¶11-12, 25, 35-36. The Committee contends that such write downs would have had a "dramatic impact on FEGS's past financial performance," and that making them would have avoided an $18.3 million "body blow" loss in 2014 from which FEGS could not recover. *Id.* ¶¶12, 25, 27, 35-36.

FEGS was indeed losing lots of money in 2013 and 2014 leading up to its bankruptcy in 2015, but that was not because of anything alleged in the complaint and it was not a secret to FEGS. Although the complaint repeatedly alleges that FEGS reported an $18.3 million loss for

---

[4] Again, these numbers come from FEGS's consolidated financial statements, which also include financial information for non-debtor entities, and the complaint does not distinguish between the financial statements for FEGS and its non-debtor subsidiaries.

2014, FEGS's actual reported change in net assets (i.e., loss) in 2014 was $19,407,085. *Compare* Compl. ¶¶25, 36 *with* Ex. H at Ex. B *and with* Ex. I ¶22. Yet, even if FEGS's entire bad debt expense increase between 2013 and 2014 (of just over $6.3 million) were attributable to FEGS's decision to write-off WeCare receivables (as the complaint assumes, without any factual support, from the consolidated financial statements), that would explain less than one-third of FEGS's $19,407,085 loss in 2014. Compl. ¶¶24-25. What the complaint conveniently omits, but what FEGS previously admitted to this Court, is that FEGS suffered a 2014 operating loss of more than $11 million notwithstanding any write off for accrued accounts receivable. Ex. I ¶22; *see also* Ex. H at Ex. B (Consolidated Statement of Activities) (indicating that while FEGS's revenue increased by more than $10 million in 2014, its expenses increased by more than $33 million in large part because of increases in total salaries and related expenses of more than $22 million, not an increase in bad debt expenses). Also missing from the complaint is FEGS's prior admission that, regardless of its bad debt expenses *in 2013*, its "operating losses would have approached $5.5 million but for a one-time extraordinary gain of $4.5 million deriving from an insurance settlement and gains at certain of FEGS's consolidated affiliates." Ex. I ¶22.

The Committee not only omits critical, harmful facts from its complaint, which are fatal to its claims, but it makes up facts that do not exist to convey the false impression that FEGS's deteriorating financial condition was somehow linked to erroneous accounting treatment of its accounts receivable. The complaint alleges that, once FEGS determined to address the issue with its allegedly overstated WeCare receivables, FEGS's "allowance for doubtful accounts receivable more than doubled for the fiscal year ending June 30, 2014, to $13.7 million." Compl. ¶¶14, 18-19 (comparing allowance for doubtful accounts receivable of $13,700,000 in 2014 with allowance of $6,700,000 in 2013). But this allegation is false and it is directly contradicted by

FEGS's own financial statements, which indicate that the allowance was similar in both 2013 and 2014. *See* Ex. H at Ex. A (Consolidated Balance Sheet) (comparing allowance for doubtful accounts receivable *of $7,500,000* in 2014 with allowance of $6,700,000 in 2013).[5]

## ARGUMENT

### I.   Legal Standards

To survive a motion to dismiss, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation" *Id.* (citing *Twombly*, 550 U.S. at 555). Instead, the allegations "must create the possibility of a right to relief that is more than speculative." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Similarly, "the Court need not accept as true any allegations that are contradicted by documents deemed to be part of the complaint, or materials amenable to judicial notice." *In re Yukos Oil Co. Sec. Litig.*, No. 04 Civ. 5243(WHP), 2006 WL 3026024, at *12 (S.D.N.Y. Oct. 25, 2006) (citing, *inter alia*, *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995)).

To state a claim for accounting malpractice, a plaintiff must allege a departure from accepted standards of practice and that the departure was a proximate cause of the injury. *See*

---

[5] The complaint repeats this error elsewhere. Complaint ¶35 (mistakenly referring to the "massive $13.7 million writeoff in 2014").

9

*Kristina Denise Enters., Inc. v. Arnold*, 41 A.D.3d 788, 788 (2d Dep't 2007); *D.D. Hamilton Textiles v. Estate of Mate*, 269 A.D.2d 214, 215 (1st Dep't 2000). Thus, not only must the plaintiff allege what the accountant or auditor did wrong to materially deviate from recognized and accepted professional standards, such as Generally Accepted Auditing Standards (GAAS), but it must "establish, beyond the point of speculation and conjecture, a causal connection between its losses and the accountant's actions." *KBL, LLP v. Cmty. Counseling & Mediation Servs.*, 123 A.D.3d 488, 488 (1st Dep't 2014); *Cumis Ins. Soc'y., Inc. v. Tooke,* 293 A.D.2d 794, 798 (3d Dep't 2002); *Gold v. Lipsky, Goodkin & Co.*, No. 152519/12, 2013 WL 6516619, at *4-5 (Sup. Ct. N.Y. Cty. Nov. 27, 2013). Specifically, "[p]roximate causation requires [the plaintiff] to prove '(1) that the defendant's malpractice actually caused [its] injury; and (2) that the injury was a foreseeable consequence of the malpractice.'" *Paladini v. Capossela, Cohen, LLC*, No. 11 Civ. 2252(LAP), 2012 WL 3834655, at *3 (S.D.N.Y. Aug. 15, 2012), *aff'd*, 515 F. App'x 63 (2d Cir. 2013). Put slightly differently, in addition to establishing that "but for" a defendant's actions the plaintiff would not have suffered damages, the element of proximate cause limits a defendant's liability to "those with respect to whom his acts were a substantial factor in the sequence of responsible causation, and whose injury was reasonably foreseeable or anticipated as a natural consequence." *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 123 (2d Cir. 2003) (internal quotation marks omitted). A court should thus dismiss an action where "the connection between the [alleged] violation and the injury alleged is too attenuated to satisfy the proximate cause requirement," *id.*, or where the alleged "chain of causation . . . is far too long to constitute proximate cause." *Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 249 (S.D.N.Y. 1996). "Conclusory allegations that do not meet *Twombly's* plausibility standard with respect to the

need for a proximate causal relationship" are insufficient to prevent dismissal. *Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013).

II.    **The Complaint Fails to Allege That Loeb & Troper Departed From Accepted Standards of Practice**

The complaint fails at the most fundamental level because it does not allege how Loeb & Troper's actions materially deviated from any accepted standards of practice. *See In re Parmalat Sec. Litig.*, 377 F. Supp. 2d 390, 410-411 (S.D.N.Y. 2005); *D.D. Hamilton Textiles*, 269 A.D.2d at 215; *Cumis Ins. Soc'y.*, 293 A.D.2d at 798; *Gold*, 2013 WL 6516619, at *4-5. The Committee offers only sparse and conclusory allegations that fall short of alleging a plausible claim for relief. *See D.D. Hamilton Textiles*, 269 A.D.2d at 215; *Iqbal*, 556 U.S. at 678.

Allegations concerning FEGS's own alleged errors in accounting for its accounts receivable do not establish a prima facie case for accounting malpractice against Loeb & Troper because such allegations do not establish what, if anything, Loeb & Troper did wrong. *See In re Parmalat*, 377 F. Supp. 2d at 410-411 (dismissing claims against auditor even under previously liberal notice pleading standard, where audit client's financial statements were allegedly mistaken, but where plaintiff did not explain how any of the alleged reports or actions by the auditor fell below the requisite standard of care); *D.D. Hamilton Textiles*, 269 A.D.2d at 215 (dismissing complaint where plaintiffs alleged that they failed to file tax returns but made only "conclusory allegations [that] fail[ed] to demonstrate that [accountant] deviated from any accepted standards of practice"); *Gold*, 2013 WL 6516619, at *4-5 (dismissing complaint where plaintiffs failed to file timely tax documents but where "plaintiffs have failed to adequately plead any specific GAAP or GAAS violations" by their accountants).

For example, in the critical section of the complaint under the heading "The WeCare Contracts," where the Committee explains how the WeCare contract worked, after doing so, the

11

Committee identifies a number of things that FEGS failed to do under the contract, and then

concludes with this important paragraph:

> As a result of **FEGS's failure to properly account** for the Doubtful WeCare
> Receivables, **FEGS overstated its accounts receivables** for its fiscal years ending
> June 30, 2011 through June 30, 2013. In addition, as a result of this
> overstatement, FEGS also incurred losses that were not reflected on its financial
> statements during the fiscal years ending June 30, 2011 through June 30, 2013.
> FEGS waited until preparing its financial statement for the fiscal year ending June
> 30, 2014 to address the receivables it had overstated for years.

Compl. ¶¶9, 11-12 (emphasis added). Allegations about what FEGS failed to do, or how FEGS

overstated its account receivables, do not provide any support for claims against Loeb & Troper.

The next 19 or so paragraphs also concern what FEGS did, or failed to do. *See id.* ¶¶14-32.[6]

In contrast to the specific allegations concerning FEGS's mistakes, the complaint says

almost nothing about what Loeb & Troper did wrong. For example, the complaint alleges that

"[Loeb & Troper] owed a duty to [FEGS] to exercise reasonable care and skill in the

performance of its audits . . . Loeb & Troper's services to FEGS fell below a reasonable standard

of care." *Id.* ¶38. Yet, this is nothing more than a conclusory allegation lacking sufficient factual

matter to state a plausible claim for relief. *Iqbal*, 556 U.S. at 678. Elsewhere, the complaint

alleges simply that "Loeb & Troper did not address or raise any concerns about FEGS's

overstated accrual of accounts receivable." Compl. ¶¶13, 33. But, this too is a far cry from

offering sufficient factual matter to establish that Loeb & Troper materially deviated from

accepted professional auditing standards, such as GAAS, particularly where the complaint even

---

[6] Even when focusing on what FEGS allegedly did wrong, the complaint merely asserts in a conclusory fashion that FEGS "did not properly account" for the WeCare receivables and as a result "FEGS overstated its accounts receivable" and "incurred losses that were not reflected on its financial statements." Complaint ¶¶11-12. But the mere fact that FEGS's accounts receivable may have been "overstated" by some unspecified amount (simply because of a mistaken management estimate for bad debts) or that certain losses were not reflected on FEGS's financial statements (for the same reason) does not establish that those statements were materially misstated or failed to comply with Generally Accepted Accounting Principles (GAAP).

12

fails to allege that FEGS's financial statements were not compliant with GAAP. *See In re Parmalat*, 377 F. Supp. 2d at 410-11; *D.D. Hamilton Textiles*, 269 A.D.2d at 215; *Gold*, 2013 WL 6516619, at *4-5.

Loeb & Troper, by undertaking to audit FEGS's accounts, did not thereby guarantee their correctness nor did Loeb & Troper somehow become an insurer against all of FEGS's potential financial mistakes. *See Mishkin v. Peat, Marwick, Mitchell & Co.*, 744 F. Supp. 531, 538 (S.D.N.Y. 1990); *DeLollis v. Friedberg, Smith & Co., P.C.*, 600 F. App'x 792, 795-96 (2d Cir. 2015). Pursuant to the parties' engagement letters and applicable auditing standards, FEGS hired Loeb & Troper to determine with "reasonable, but not absolute," assurance whether FEGS's financial statements were free from material misstatements. *Id.*; *see also* Ex. A at 2-3; Ex. B at 1-4; Ex. C at 2-4; Ex. D at 2-4. Moreover, FEGS's management, not Loeb & Troper, was responsible for exercising subjective judgment to make estimates for FEGS's doubtful accounts, which is the sole issue raised by the complaint. Ex. A at 2-3; Ex. B at 1-4; Ex. C at 2-4; Ex. D at 2-4; *see also, e.g.*, Ex. G at Note 2(C) and (G) (explaining use of estimates). Even if ***FEGS's*** own subjective judgment in making these estimates was flawed, the complaint is completely silent about what professional standards ***Loeb & Troper*** violated when auditing these management estimates. *See, e.g.*, *In re Parmalat*, 377 F. Supp. 2d at 410-411.

The most the complaint can muster is a conclusory allegation of negligence in prior years supported only by something that Loeb & Troper did ***correctly*** in 2014, without alleging how exactly Loeb & Troper departed from the accepted standards of care in earlier years: "Each of the issues identified in the 2014 management letter could and should have been identified in prior management letters relating to the 2011, 2012, and 2013 financial statements." Compl. ¶35. Indeed, the complaint alleges that FEGS did not even acknowledge an issue with outstanding

13

WeCare receivables until 2014, at which time Loeb & Troper properly reviewed it. Compl. ¶¶12, 25, 34. The complaint merely asserts that during the audits between 2011 to 2013 Loeb & Troper should have identified the same internal control issues that it identified to FEGS during its 2014 Audit and that from 2011 to 2013 Loeb & Troper "simply looked the other way while FEGS's financial statements swept problems under the rug." *Id.* ¶¶33-35.[7] Despite having had two years to investigate potential claims, the complaint does not even attempt to set forth any facts whatsoever to support this conclusory allegation. *Iqbal*, 556 U.S. at 678. Nor can one plausibly infer simply from Loeb & Troper's proper 2014 Audit that Loeb & Troper did anything wrong when performing separate audits in prior years simply because Loeb & Troper did not raise the exact same issues each and every year. *Id.*

Similarly, the mere fact that FEGS took a write-down for bad debt in 2014 does not mean that it necessarily should have taken a similar write-down in earlier years (and it certainly does not mean that Loeb & Troper departed from accepted standards of care by not raising the issue). As a basic matter of accounting (and common sense), just because it became known in 2014 that certain accounts receivable were uncollectible and needed to be written off at that point in time, it does not plausibly follow that it was known in prior years that those amounts would be uncollectible and should have been written off earlier. *Id.* The complaint is completely devoid of

---

[7] Even if this conclusory allegation were accepted as true it would defeat the Committee's claims. If FEGS "swept problems under the rug" then it either knew about those problems, and therefore cannot plausibly allege that its ignorance of the problems caused it harm, *see Drabkin v. Alexander Grant & Co.*, 905 F.2d 453, 457 (D.C. Cir. 1990) (citing *Devaney v. Chester*, No. 83 CIV. 8455 (JFK), 1989 WL 52375, at *5 (S.D.N.Y. May 10, 1989)), or worse, FEGS attempted to hide those problems, and the Committee may not now assert claims arising from FEGS's own knowing misconduct, *see Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 120 (2d Cir. 1991) (denying standing to insolvency representative to assert claims against third parties arising from management's own wrongful conduct); *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 464 (2010) (imputing wrongful conduct of management to insolvency representative and barring malpractice claims against accountants).

any facts which would establish when and to what extent any WeCare receivables should have been deemed uncollectible. *Id.* Instead, it simply lumps together an undifferentiated set of "numerous instances" during a broad timespan (including 2014) in which "FEGS carried such denied payments as an accounts receivable on its books and records without making any allowance for bad debt" and does not allege any facts that establish how Loeb & Troper failed to adhere to professional standards when auditing FEGS's accounts receivable prior to 2014. Compl. ¶¶11-12; *In re Parmalat*, 377 F. Supp. 2d at 410-411.

Finally, because the complaint is premised solely upon the absence of internal control findings in prior year management letters similar to findings in the 2014 management letter, the complaint should also be dismissed because Loeb & Troper was not hired to audit FEGS's internal controls. *See Italia Imports v Weisberg & Lesk*, 220 A.D.2d 226, 226-227 (1st Dep't 1995) (dismissing complaint where accountant and client contractually agreed that the accountant was not to perform certain services, thereby absolving the accountant of liability for not performing them). The parties contractually agreed that, although Loeb & Troper would consider FEGS's relevant internal controls for purposes of expressing an opinion on FEGS's financial statements, it would not do so for the purpose of expressing an opinion on internal controls, but would merely report any significant deficiencies or material weaknesses that it identified during the course of the audits. Ex. A at 4; Ex. B at 4-5; Ex. C at 3; Ex. D at 3. In any event, as discussed further below, the accounts receivable internal control issues discussed in the 2014 management letter had nothing to do with FEGS's bankruptcy.

In short, from these sparse and conclusory allegations, it cannot plausibly be inferred that Loeb & Troper departed from accepted professional standards when auditing FEGS's accounts

receivable between 2011 and 2013. *See In re Parmalat*, 377 F. Supp. 2d at 410-411; *D.D. Hamilton Textiles*, 269 A.D.2d at 215; *Gold*, 2013 WL 6516619, at *4-5.

### III.    The Complaint Fails to Allege That Loeb & Troper Proximately Caused Any Damage to FEGS

Not only do the complaint's sparse allegations fail to allege that Loeb & Troper deviated from accepted standards of practice, but the complaint also does not plausibly allege a causal link between Loeb & Troper's audits and FEGS's bankruptcy.[8] And make no mistake about it, the complaint claims that Loeb & Troper's alleged audit malpractice caused FEGS to file for bankruptcy: "The $18.3 million loss reported in 2014 was a body-blow to FEGS and ultimately caused FEGS to commence its chapter 11 case." Compl. ¶36.

There are no factual allegations plead in this complaint to support such an absurd conclusion and the complaint leaves out previously admitted facts that directly refute it. *Iqbal*, 556 U.S. at 678; *In re Yukos Oil Co. Sec. Litig.*, 2006 WL 3026024, at *12. FEGS's bankruptcy was caused by a series of problems over numerous years, having nothing to do with Loeb & Troper's audits or management letters. The Committee may wish to remain silent about all of this, but the Court already heard it directly from FEGS (in whose shoes the Committee now stands, *see* Compl. ¶5). When FEGS filed for bankruptcy more than two years ago, FEGS provided the Court with an exhaustive list of "factors and events," which FEGS explained led to its "financial crisis" and "[bankruptcy] filing." Ex. I ¶¶19-21. FEGS compiled this list months after Loeb & Troper performed the 2014 Audit and after what FEGS described as a

---

[8] The complaint asserts that "the full scope of FEGS's damages is not possible to calculate at this time" and therefore only vaguely alleges any actual damages that flow from FEGS's bankruptcy filing, including "the costs of administering FEGS's chapter 11 case." Complaint ¶¶35-35, 41. To the extent the Committee seeks any other special damages flowing from FEGS's bankruptcy it was required to have specifically alleged them. *See* Fed. R. Civ. P. 9(g) (as made applicable to this adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7009).

"comprehensive analysis" and an "intensive review process." *Id.* ¶24. Yet, on that list, not a single mention was made of any materially misstated FEGS financial statements or improper Loeb & Troper annual audits. *Id.* ¶¶19-21. Nor was there any discussion at all about mistaken allowances for doubtful accounts, estimates for bad debts, or accounts receivables (WeCare-related or otherwise). *Id.* The Committee's recent effort to manufacture an entirely new and implausible reason for FEGS's bankruptcy should be rejected.

Further underscoring the implausibility of the allegations in the complaint are FEGS's own contemporaneous financial statements, which tell an entirely different story. Somehow, according to the complaint, if only FEGS had better estimated its doubtful WeCare accounts receivable and written off bad debts of just over six million dollars sometime during the three years between 2011 and 2013 (though it is not plausible from the vague allegations in the complaint that it had any reason to do so), it would not have been in the financial condition in which it found itself in 2014 or had to file for bankruptcy in 2015. Compl. ¶¶11-12, 35-36, 41. This makes no sense. FEGS had hundreds of millions of dollars in annual revenues ($263 million in 2014), tens of millions of dollars in net assets ($39 million in 2014), and millions of dollars in cash at its disposal ($10 million in 2014)—all of which was equally true in 2011 and continued to be true all the way up through the end of fiscal year 2014, even after the complaint alleges that the accounting error associated with the WeCare receivables caused FEGS's demise. Exs. E-H. From every angle, FEGS's financial statements refute the allegations in the complaint.

First of all, it is implausible (to put it mildly) that a mistaken bad debt estimate of around six million dollars over a three-year period (or two million dollars or so on average) would have had a "dramatic" impact on FEGS's "financial performance" which included more than a quarter *billion* dollars in annual revenue. Compl. ¶27; Ex. H at Ex. B. The complaint does not even

17

begin to explain how FEGS would have avoided bankruptcy if it just would have reported a couple of million dollars less (or less than 1%) of its annual income each year. At most, the complaint simply points out that FEGS's "revenues were historically reported to be little more than its expenses (given FEGS's size)." Compl. ¶27. This is not only an unremarkable income statement picture for a nonprofit corporation like FEGS, but it does not remotely establish a plausible connection between FEGS's alleged accounting errors and its bankruptcy. FEGS's allegedly sharp downturn in net income was occurring over a sustained period regardless of its alleged errors accounting for bad debts. *Id.* ¶¶27-32, 36. As early as 2013, two years before it filed for bankruptcy, FEGS would have lost around $5.5 million but for a one-time extraordinary gain. Ex. I ¶22. And FEGS's multimillion dollar loss in 2014—which, the complaint mistakenly says was $18.3 million when in fact it was $19.4 million, *see supra*, pp. 7-8—was due to a more than ***$11 million operating loss*** in 2014, which did ***not*** include the write-off for bad debts. Ex. I ¶22. If FEGS's continuing losses in 2014 were a "body blow" or "shocking disclosure" to FEGS, this was due to FEGS's deliberate avoidance and mismanagement of its deteriorating financial condition, not the result of any alleged accounting errors. Compl. ¶36; Ex. I ¶¶19-24.

Nor would the alleged accounting errors have had any effect on FEGS's balance sheet that could plausibly be connected to its bankruptcy. FEGS's balance sheets during the time in which FEGS allegedly failed to account for around six million dollars in doubtful WeCare receivables showed net assets many times larger than that. Ex. E at Ex. A, Ex. F at Ex. A; Ex. G at Ex. A; Ex. H at Ex. A. It is also beyond dispute that, as a basic accounting matter, even if FEGS had removed the six million or so dollars in assets from its balance sheet over time rather than all at once at the end of 2014, FEGS's balance sheet at the end of 2014 (with total net assets

18

of $39 million) would have looked exactly the same because either way FEGS would end up with six million dollars fewer assets. Ex. H at Ex. A.

Finally, the alleged accounting errors cannot plausibly be connected to a cash flow issue that caused FEGS's bankruptcy. FEGS's cash flow statements during the relevant time showed significant positive cash flow, including in 2014 when FEGS's cash balance *increased* to $10,205,618 from $6,734,624 in 2013, despite the allegedly cumulative write down in 2014. Ex. H at Ex. D. Despite the complaint's suggestion to the contrary (at ¶26), it is a rudimentary accounting principle that bad debt "expenses" are non-cash charges that have no impact at all on actual cash flow. Thus, even if FEGS had incurred additional bad debt expenses in prior years, rather than all at once in 2014, that would not have impacted any of FEGS's cash flow statements or its actual cash on hand ($10 million) at the end of fiscal year 2014. Ex. E at Ex. D; Ex. F at Ex. D; Ex. G at Ex. D; Ex. H at Ex. D.

Despite the Committee's after-the-fact, litigation-driven efforts to rewrite history, it is simply not plausible that any erroneous accounting for certain WeCare receivables played a part (let alone a substantial part) in FEGS's decision to file for bankruptcy. Nor do FEGS's conclusory allegations make it so. *Rothstein*, 708 F.3d at 97. The complaint, therefore, fails both the threshold "but for" causation test—because FEGS's bankruptcy filing would have occurred, according to FEGS, regardless of any accounting or auditing errors alleged in the complaint— and the more demanding proximate causation test—because these accounting errors could not have been a substantial factor or foreseeably resulted in FEGS's bankruptcy. *See id.*, 708 F.3d at 91 (affirming dismissal because the complaint failed to allege proximate cause); *Paladini*, 2012 WL 3834655, at *3 n.4 (dismissing implausible complaint for lack of proximate causation where it was clear that plaintiff's bankruptcy "resulted from other events that took place before the

19

audit"); *Kolbeck*, 939 F. Supp. at 249 (denying plaintiffs' motion to amend because agent's "failure to register, and defendants' failure to investigate that lapse, had little if anything to do with plaintiffs' losses"); *D.D. Hamilton Textiles*, 269 A.D.2d at 215 (dismissing complaint where record was clear that sole proximate cause of plaintiffs injury was its severe financial distress and inability to meet tax obligations).

In any event, it is far too speculative to plausibly link any damages flowing from FEGS's bankruptcy either to FEGS's allegedly incorrect management estimates concerning the WeCare receivables or to Loeb & Troper's audits of FEGS's financial statements. The complaint posits that "[i]f the losses had been recognized as they were occurring, FEGS could have addressed the problem in a manner that would have avoided a liquidation under chapter 11." Compl. ¶12. Similarly, the complaint alleges in a conclusory fashion that "[t]he cumulative amount of the disclosure . . . resulted in more harm to FEGS than if the financial statements had accurately reflected FEGS's financial condition at the [earlier] time." *Id.* ¶41. Yet, these grossly speculative and conclusory allegations are insufficient. *Iqbal*, 556 U.S. at 678; *Rothstein*, 708 F.3d at 97. The complaint does not aver any facts to explain how an earlier writedown would have made FEGS better off in 2014 or staved off bankruptcy in 2015, nor is this a plausible outcome given FEGS's many other problems. Compl. ¶¶12, 35-36, 41; Ex. I ¶¶19-21. In the absence of any such plausible allegations, the complaint should be dismissed. *See In re Parmalat Sec. Litig.*, 501 F. Supp. 2d 560, 578 (S.D.N.Y. 2007), *aff'd sub nom. Pappas v. Bank of Am.,* 309 F. App'x 536 (2d Cir. 2009) (dismissing audit malpractice claims which did not raise a right to relief beyond the speculative level because complaint alleged implausible chain of events which would have led to earlier reorganization making debtor better off); *Phillips-Smith Specialty Retail Group II, L.P. v. Parker Chapin Flattau & Klimpl*, 265 A.D.2d 208, 210 (1st Dep't 1999) (dismissing action for

legal malpractice for lack of proximate causation where "the hypothetical course of events on which any determination of damages would have to be based, involving the nature and timing of acts by plaintiffs themselves . . . and the bankruptcy court, constitutes a chain of 'gross speculation on future events' . . . which is incapable of proof"); *Cannonball Fund, Ltd. v. Marcum & Kliegman LLP*, No. 2011-651674, 2012 WL 9500858, at *4 (Sup. Ct. N.Y. Cty. Apr. 6, 2012), *aff'd,* 110 A.D.3d 417 (1st Dep't 2013) (granting motion to dismiss complaint which asserted speculative damages and "fail[ed] to allege specific course of actions" that would have been taken to avert alleged damages); *Pearlman v. Friedman Alpren & Green LLP*, 300 A.D.2d 203, 203-04 (1st Dep't 2002) (affirming granting of motion to dismiss negligence claim which asserted grossly speculative chain of events allegedly resulting in damages).

Perhaps recognizing the implausibility of its allegations that Loeb & Troper caused FEGS's bankruptcy or forced it into liquidation, the Committee alternatively tries to recover for damages allegedly suffered not by FEGS, but by FEGS's creditors (including, of course, members of the Committee). Compl. ¶¶40-41 (alleging that FEGS "incurred debt" and that damages were "in no event less than the losses incurred by holders of allowed claims against FEGS," i.e., creditors to whom FEGS's "incurred debt" has not been repaid). But these claimed damages are not recoverable. The Court granted the Committee standing only to bring claims belonging to the debtor's estate and the Committee purports to bring this action "on behalf of the Debtor's estate." *Id.* ¶5. An insolvency representative purportedly suing on behalf of the debtor, such as a bankruptcy trustee, or the Committee, does not have standing to bring claims belonging to the creditors of a corporation. "It is well settled that a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself." *Wagoner*, 944 F.2d at 118 (citing *Caplin v. Marine Midland*

21

*Grace Trust Co. of N.Y.*, 406 U.S. 416, 434 (1972)). This is so even where specific creditors allegedly suffered harm. *See Kirschner v. Grant Thornton LLP*, No. 11604, 2009 WL 996417, at *9 (S.D.N.Y. Apr. 14, 2009) ("The fact that [the company] could not repay its 'loans' . . . upon incurring $1.4 billion in new leveraged buyout ("LBO") debt . . . is a harm not to [the company] but to [the company's] creditors, to whom the assets were owed."); *In re Parmalat*, 501 F. Supp. at 576 (claim based on damage that consists of liabilities that the debtor did not pay is really a claim belonging to the creditors, not the debtor who lacks standing); *Hirsch v. Arthur Andersen & Co.*, 178 B.R. 40, 43 (D. Conn. 1994), *aff'd*, 72 F.3d 1085 (2d Cir. 1995) (when the damages alleged by the trustee are the unpaid obligations of the debtors, those damages are identical to those suffered by the creditors, and the trustee lacks standing to assert those claims). Thus, the Committee cannot salvage its speculative damage claims simply by seeking damages belonging to the creditors themselves, which the Committee lacks standing to assert. *See id.*

In sum, the complaint should be dismissed because it does not allege any plausible connection between Loeb & Troper's alleged conduct and any damages suffered by FEGS.

## IV.    The Committee's Claims Are Time Barred

The complaint should also be dismissed because the negligence claims are time barred. A three-year statute of limitations applies to "an action to recover damages for malpractice . . . regardless of whether the underlying theory is based in contract or tort." N.Y. C.P.L.R. § 214(6). The three-year limitations period under C.P.L.R. § 214(6) runs from the date the audit opinion was issued, not from the date the client discovered the alleged negligence. *See Williamson v. PriceWaterhouseCoopers LLP*, 9 N.Y.3d 1, 7-8 (2007); *Apple Bank for Sav. v. PriceWaterhouseCoopers LLP*, 70 A.D.3d 438, 438-39 (1st Dep't 2010). The complaint was filed on March 20, 2017. Thus, the claims in the complaint are untimely and should be dismissed

22

because they arise from the 2011 Audit (issued January 6, 2012), 2012 Audit (issued December 17, 2012), and 2013 Audit (issued December 2, 2013), all of which were issued well more than three years prior to the filing of the complaint in March 2017. *Id.*

The Committee will undoubtedly assert that its claims are timely pursuant to 11 U.S.C. § 108, which provides in relevant part that:

> If applicable non-bankruptcy law, an order entered in a non-bankruptcy proceeding, or an agreement fixes a period within which the debtor may commence an action, ***and such period has not expired before the date of the filing the petition, the trustee*** may commence such action only before the later of (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case, or (2) ***two years after the order for relief***.

11 U.S.C. § 108 (emphasis added).

But this bankruptcy tolling provision does not save the Committee's claims. The order for relief (i.e., Petition) was filed on March 18, 2015. Compl. ¶1. By that time, however, the three-year statute of limitations for bringing any claims arising from the 2011 Audit, which was issued on January 6, 2012, ***had*** already expired (on January 6, 2015). Thus, at a minimum, any claims relating to the 2011 Audit should be dismissed, regardless of who is bringing them now.[9]

Moreover, while the three-year statute of limitations for bringing claims arising from the 2012 Audit (issued on December 17, 2012) and 2013 Audit (issued on December 2, 2013) had ***not*** yet expired as of March 18, 2015, the time for bringing such claims would have expired on

---

[9] The Committee may attempt to rely on the continuous representation doctrine to save its time-barred claims relating to the 2011 Audit, but that doctrine does not apply. While the Committee alleges facts which show an ongoing business relationship in the provision of periodic auditing services, it does not allege, as it must to invoke the continuous representation doctrine, that there was a continuing course of representation with respect to a particular service being rendered by Loeb & Troper. *Williamson*, 9 N.Y.3d at 10-11. Indeed, the 2011 engagement letter contemplates "other engagements" in the future to be provided under "separate engagement letters" and there is no allegation that FEGS ever engaged Loeb & Troper to provide corrective or remedial services to reexamine or redo the 2011 Audit. *Id.*; Ex. A at 5.

or about December 17, 2015 and December 2, 2016, respectively, except that the "trustee" could

have commenced an action arising from these audits up to "two years after the order for relief,"

or by March 20, 2017. 11 U.S.C. § 108.[10] Here, however, while the Committee purports to bring

this complaint (filed on March 20, 2017) on behalf of FEGS's estate pursuant to a Standing

Stipulation so ordered by this Court, Compl. ¶5, FEGS is operating as a debtor in possession and

no trustee has been appointed in the chapter 11 case. *Id.* ¶1. We acknowledge that, despite the

plain text of 11 U.S.C. § 108, which provides additional time to commence an action only to a

"trustee" in a chapter 11 proceeding, some courts have extended the benefits of this provision to

debtors in possession or their agents. *See, e.g.*, *Motor Carrier Audit & Collection Co., a Div. of

Delta Traffic Serv. v. Lighting Prod., Inc.*, 113 B.R. 424, 426 (N.D. Ill. 1989). Yet, we are aware

of no controlling authority in this Circuit (or elsewhere) specifically extending the provisions of

11 U.S.C. § 108 to a committee of unsecured creditors, even where that committee purports to

bring claims on behalf of the debtor's estate. To do so would impermissibly extend the reach of

the statute beyond its plain meaning.[11] *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242,

251 (2010) (interpreting federal statute awarding attorney's fees to "either party" according to its

plain text and rejecting lower court's holding that a fee claimant must be a "prevailing party").

Even if the Court were to conclude that the Committee's claims relating to the 2012

Audit and 2013 Audit are timely under 11 U.S.C. § 108, the untimely claims relating to the 2011

Audit still require the complaint to be dismissed in its entirety for failure to comply with the

---

[10] Because the last day of the limitations period if the two-year extension were otherwise applicable, March 18, 2017, fell on a weekend, the period would have been further extended until March 20, 2017. Fed. R. Civ. P. 6(a)(1)(C); Fed. R. Bank. P. 9006(a)(1)(C).

[11] Of course, to the extent the Committee is seeking to recover for damages suffered by the **creditors**, not only does it lack standing to do so, *see supra*, pp. 21-22, but such creditor claims would also be time-barred and not subject to any extension under 11 U.S.C. § 108.

24

pleading standard in Fed. R. Civ. P. 8(a) (as made applicable to this adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7008). The Committee only vaguely alleges that FEGS could have avoided bankruptcy if it had written down accounts receivable at some unspecified time over a three-year period between 2011 and 2013. Compl. ¶¶11-12, 25, 35-36. Thus, it is entirely unclear from the complaint whether the alleged negligence that caused harm to FEGS occurred in 2011, 2012, or 2013. That leaves the Court with no way to determine "what damages were substantially caused by what acts of negligence" and consequently, if the Court dismisses any claims arising from the 2011 Audit, the Court will be unable to "identify an intact section of [the Committee's] pleading operable as a sufficient claim." *See Abramo v. Teal, Becker & Chiaramonte, CPA's, P.C.*, 713 F. Supp. 2d 96, 105-07 (N.D.N.Y. 2010) (dismissing entire complaint pursuant to Fed. R. Civ. P. 8(a), even where some claims arguably were timely where plaintiff did not "differentiat[e] the action … with respect to the impact of the statute of limitations" on its other claims).

## CONCLUSION

For the foregoing reasons, the complaint should be dismissed with prejudice.

Dated: New York, New York
     May 5, 2017

                                 STROOCK & STROOCK & LAVAN LLP

                          By:   /s/ James Bernard
                                 James L. Bernard
                                 David M. Cheifetz
                                 180 Maiden Lane
                                 New York, New York  10038-4982
                                 (212) 806-5400

                                 *Attorneys for Loeb & Troper LLP*